# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**AMERICAN ANTI-VIVISECTION SOCIETY**

    and

**AVIAN WELFARE COALITION**

               Plaintiffs,

    v.                                                   Civil Case No. 1:18-cv-1138 (TNM)

**UNITED STATES DEPARTMENT OF AGRICULTURE**

    and

**SONNY PERDUE**, in his official capacity as United States Secretary of Agriculture,

               Defendants.

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION .................................................................................................... 1

II.  FACTUAL ALLEGATIONS AND LEGAL BACKGROUND ....................................... 4

III.  ARGUMENT ...................................................................................................... 12

    A.  Legal Standards for Motions to Dismiss Under Rules 12(b)(1) and 12(b)(6) .................................................................................................. 12

    B.  Each Plaintiff has standing and dismissal is therefore not warranted under Rule 12(b)(1) ............................................................................................. 13

        1.  Avian Welfare Coalition ("AWC") .................................................... 15

        2.  American Anti-Vivisection Society ("AAVS") ...................................... 22

    C.  Plaintiffs have stated a claim that Defendants have failed to act in violation of their statutory obligations. ................................................... 24

        1.  Section 706(1) of the APA ................................................................ 26

        2.  Section 706(2) of the APA ................................................................ 33

IV.  CONCLUSION .................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach,*
469 F.3d 129 (D.C. Cir. 2006)................................................................13, 14, 17, 19

*Alliance to Save Mattaponi v. U.S. Army Corps of Engineers,*
515 F. Supp. 2d 1 (D.D.C. 2007)...........................................................................24

*Alterns. Research & Dev. Found. v. Glickman,*
101 F. Supp. 2d 7 (D.D.C. 2000)...........................................................................5

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)...............................................................................................13

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)...............................................................................................13

*Bennett v. Spear,*
520 U.S. 154 (1997)...........................................................................................34, 35

*Cause of Action Institute v. Tillerson,*
285 F. Supp. 3d 201 (D.D.C. 2018).....................................................................18, 24

*Center for Biological Diversity v. Zinke,*
260 F. Supp. 3d 11 (D.D.C. 2017).........................................................................26

*Chase Bank USA, N.A. v. McCoy,*
562 U.S. 195 (2011)...............................................................................................31

*Coalition for Sustainable Resources, Inc. v. U.S. Forest Service*
259 F.3d 1244 (10th Cir. 2001) ............................................................................34

*Cobell v. Norton,*
240 F.3d 1081 (D.C. Cir. 2001)............................................................................26

*Environmental Working Group v. U.S. Food and Drug Administration,*
301 F. Supp. 3d 165 (D.D.C. 2018)....................................................................14, 21

*Food & Water Watch v. Vilsack,*
808 F.3d 905 (D.C. Cir. 2015) .................................................................. *passim*

*Havens Realty Corp. v. Coleman,*
455 U.S. 377 (1982)...............................................................................................13

*Hi-Tech Pharmacal Co., Inc. v. U.S. Food and Drug Admin.*,
   587 F. Supp. 2d 1 (D.D.C. 2008) ............................................................34

*Lewis v. Pension Benefit Guaranty Corp.*,
   314 F. Supp. 3d 135 (June 11, 2018) .......................................................31

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992).................................................................................13

*Nat'l Ass'n of Home Builders v. EPA*,
   667 F.3d 6 (D.C. Cir. 2011) .....................................................................20

*National Taxpayers Union, Inc. v. United States*,
   68 F.3d 1428 (D.C. Cir. 1995)............................................................20, 21

*Natural Resources Defense Council, Inc. v. Administrator, U.S. EPA*,
   902 F.2d 962 (D.C. Cir. 1990), *vacated in part*, 921 F.2d 326 (D.C. Cir. 1991) ...................34

*\*Norton v. Southern Utah Wilderness Alliance*,
   542 U.S. 55 (2004)..............................................................................27, 32

*\*People for the Ethical Treatment of Animals v. U.S. Department of Agriculture*,
   7 Supp. 3d (D.D.C. 2013) .................................................................. *passim*

*\*People for the Ethical Treatment of Animals v. U.S. Department of Agriculture*,
   797 F.3d 1087 (D.C. Cir. 2015) .......................................................... *passim*

*Ramirez v. U.S. Immigration and Customs Enforcement*,
   310 F. Supp. 3d 7 (D.D.C. 2018) .............................................................27

*Sierra Club v. Jackson*,
   648 F.3d 848 (D.C. Cir. 2011) .................................................................27

*Sierra Club v. Thomas*,
   828 F.2d 783 (D.C. Cir. 1987) .............................................................3, 34

*Sierra Club v. Yeutter*,
   911 F.2d 1405 (10th Cir. 1990) ...............................................................34

*Sparrow v. United Air Lines, Inc.*,
   216 F.3d 1111 (D.C. Cir. 2000).................................................................12

*Telecommunications Research and Action Center v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984)....................................................................32

*Turlock Irrigation Dist. v. FERC*,
   786 F.3d 18 (D.C. Cir. 2015)..............................................................15, 18

*United States v. Chase*,
   135 U.S. 255 (1890) ............................................................................................... 32

*Walker v. Jones*,
   733 F.2d 923 (D.C. Cir. 1984) ..................................................................... 13, 17

*Warth v. Seldin*,
   422 U.S. 490 (1975) ............................................................................................... 13

*Wyatt v. United States*,
   271 F.3d 1090 (Fed. Cir. 2001) ......................................................................... 35

**Statutes**

5 U.S.C. § 555 ....................................................................................................... 34

5 U.S.C. § 701 ....................................................................................................... 33

5 U.S.C. § 551 ....................................................................................................... 33

5 U.S.C. § 704 ....................................................................................................... 33

*5 U.S.C. § 706 ............................................................................................. *passim*

7 U.S.C. § 2131(1) .................................................................................................. 4

*7 U.S.C. § 2132(g) (1970) .......................................................................... 4, 5, 24

7 U.S.C. § 2132(h) (1966) ................................................................................... 4

7 U.S.C. § 2133 ....................................................................................................... 5

7 U.S.C. § 2136 ....................................................................................................... 5

*7 U.S.C. § 2143 ........................................................................................... *passim*

7 U.S.C. § 2146 ............................................................................................... 5, 24

**Other Authorities**

9 C.F.R. § 1.1 ..................................................................................................... 6, 29

9 C.F.R. §§ 3.1–3.118 ........................................................................................... 6

9 C.F.R. §§ 3.125–3.142 ................................................................................. 6, 29

36 Fed. Reg. 24,917, 24,919 (Dec. 24, 1971) Amendments to Chapter .......... 4

69 Fed. Reg. 31,513 (June 4, 2004) ............................................................... 6, 29

69 Fed. Reg. 31,537-38 (June 4, 2004) Comments ....................................................................6, 30

69 Fed. Reg. 31,539 ...........................................................................................................6, 30

70 Fed. Reg. 64,097, 64,104 (Oct. 31, 2005)......................................................................7, 31

71 Fed. Reg. 72,736, 72,738 (Dec. 11, 2006)......................................................................8, 31

72 Fed. Reg. 22,266, 22,266 (Apr. 30, 2007) ..........................................................................8

72 Fed. Reg. 69,755, 69,757 (Dec. 10, 2007) ....................................................................8, 31

73 Fed. Reg. 24,640, 24,640 (May 5, 2008) .............................................................................8

73 Fed. Reg. 71,112, 71,117 (Nov. 24, 2008).....................................................................9, 31

74 Fed. Reg. 21,873, 21,873 (May 11, 2009) ....................................................................9, 31

74 Fed. Reg. 64,149 (Dec. 7, 2009) .........................................................................................9

75 Fed. Reg. 21,736, 21,736 (Apr. 26, 2010) ...................................................................10, 31

76 Fed. Reg. 39,998, 40,003 (July 7, 2011).....................................................................10, 31

77 Fed. Reg. 7664, 7677-78, 7685 (Feb. 13, 2012) ..............................................................11

78 Fed. Reg. 1,522, 1,526 (July 7, 2011)................................................................................31

78 Fed. Reg. 1522-01 (Jan. 8, 2013)......................................................................................30

78 Fed. Reg. 1522, 1526 (Jan. 8, 2013) .................................................................................11

Federal Rule of Civil Procedure 12(b)(1) ........................................................................12, 13

Federal Rule of Civil Procedure 12(b)(6) ................................................................................13

Federal Rule of Civil Procedure 12(b)(6) ................................................................................13

*U.S. Government Accountability Office, *Animal Use in Federal Research*,
    GAO-18-459 (May 31, 2018) ........................................................................................30, 35

Plaintiffs American Anti-Vivisection Society ("AAVS") and Avian Welfare Coalition ("AWC") submit the following Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint. Dkt. No. 16 (hereinafter, "Motion").

## I.        INTRODUCTION

The story of the United States Department of Agriculture ("USDA")'s failure to act to fulfill its statutory mandate to protect birds under the Animal Welfare Act ("AWA") is Kafkaesque.  For over thirty years, the USDA (primarily through its agency Animal and Plant Health Inspection Service, Animal Care ("APHIS")) defined the term "animals" in the AWA as excluding birds, even though the AWA's statutory definition had since 1970 applied to all warm-blooded animals, which indisputably includes birds.  Then, in 2002, Congress amended the AWA so that it left no doubt that birds not bred for research were animals covered by the AWA.  Under the AWA, the USDA is obligated to enact regulations to ensure the humane treatment of all covered animals, including those birds.  USDA then changed its regulatory definition of animals to apparently mirror that under the AWA.

But despite that facial change to its regulations, the USDA did not change its approach with respect to birds in any way, continuing to act as though they are not covered animals under the statute.  Instead, it has consistently and formally taken the position that existing regulations do not apply to birds and that it needs to enact regulations that would apply to birds, and so it has continued to leave birds completely unprotected.  After the USDA first stated in an Advanced Notice of Proposed Rulemaking in 2004 that existing regulations did not apply to birds and that it intended to enact applicable regulations, it has since almost annually (on at least nine separate occasions) thereafter reaffirmed in the Federal Register that it would enact regulations applicable to birds by a certain date, but then proceeded to miss every one of those deadlines.  As recently as

this year, a report by the federal Government Accountability Office ("GAO") found that USDA officials know there is a need to enact bird-related regulations, have failed to do so or even provide a timeline for doing so, and that APHIS "instructs facilities to not report any birds in their annual reports, regardless of whether the birds are covered by the act."

Plaintiffs are two organizations dedicated to the humane treatment of birds and other animals utilized in research and commercial endeavors. The USDA has expressly promised both Plaintiffs directly and the public that it would be complying with its responsibility to enact regulations that cover birds under the AWA repeatedly for at least sixteen years, each time promising that the regulations were either about to be done or were actually finished and awaiting review. Plaintiffs exhausted multiple efforts at getting USDA to do what it is required to do and what it has promised, to no avail. Without any other recourse, Plaintiffs filed this action.

In response to Plaintiffs' lawsuit challenging the USDA's failure to regulate to protect birds, the government contends that Plaintiffs have no claim under the Administrative Procedure Act ("APA"), even though that statute expressly allows plaintiffs to challenge an agency's failure to act. The USDA apparently believes it has found an eternal sweet spot of inaction where it can forever claim that 1) its existing general animal welfare regulations do not apply to birds, thus avoiding any immediate obligation to regulate or enforce under the AWA with respect to birds, 2) it still needs to adopt regulations that cover birds, and 3) because it expressed an intent to adopt regulations that apply to birds, it is shielded from actually doing so indefinitely. There is no end in sight to this charade: the government claims in its Motion that it has not "finally" declined to regulate to protect birds, even though it has failed to do so for at least sixteen years, if not half a century. Its inaction runs headlong into the APA's specific provisions designed to prohibit precisely the type of evasion of judicial review seen here: "effectively final agency action that the

2

agency has not frankly acknowledged." *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987).

The government claims that Plaintiffs here "seek the same relief that one district court and the court of appeals have already rejected" in *People for the Ethical Treatment of Animals v. U.S. Department of Agriculture* ("*PETA II*"), 797 F.3d 1087 (D.C. Cir. 2015). Mot. at 1. This is demonstrably incorrect, and Defendants are misreading the record in that case. For one, the "court of appeals" did not address whatsoever PETA's claims regarding the USDA's failure to enact regulations, because PETA did not appeal that aspect of the district court's decision. For another, the district court also did not address in any respect the second of Plaintiffs' two claims here because PETA did not raise such a claim in its complaint. *People for the Ethical Treatment of Animals v. U.S. Department of Agriculture*, 7 Supp. 3d 1, 15 (D.D.C. 2013) ("*PETA I*"). That is, Defendants imply that such a claim was rejected on the merits—where it was never even part of the plaintiff's complaint. Finally, although the district court *did* address a variant of the instant Plaintiffs' first claim for relief, Plaintiffs' allegations here are materially different. Moreover, the additional five years that have elapsed since the district court's decision in *PETA I* without any action from the agency regarding regulations that apply to birds under the AWA only further demonstrates USDA's steadfast failure to adhere to the AWA's mandate, and supports the merits of the claims made by Plaintiffs here.[1]

---

[1] The government also faults Plaintiffs for not mentioning the *PETA* cases in their Amended Complaint, Mot. at 1, 17, but a complaint is of course not a legal brief. Plaintiffs referenced no case law at all in their Amended Complaint, other than one specific case for factual background, where the USDA had reached a settlement regarding the coverage of birds under the AWA. Am. Compl. ¶ 63.

## II.      FACTUAL ALLEGATIONS AND LEGAL BACKGROUND

Congress enacted the Animal Welfare Act ("AWA"), 7 U.S.C. § 2131 *et seq.*, in 1966 in order to, *inter alia*, "insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment" and "to assure the humane treatment of animals during transportation in commerce." 7 U.S.C. § 2131(1).  In fact, Congress found it "*essential to regulate* . . . the transportation, purchase, sale, housing, care, handling, and treatment of animals." *Id.* § 2131 (emphasis added).  The AWA's original definition of "animal" only included "live dogs, cats, monkeys (nonhuman primate mammals), guinea pigs, hamsters, and rabbits." 7 U.S.C. § 2132(h) (1966).  Four years later, however, Congress expanded this definition, so that the definition of "animal" included "such other warm-blooded animal, as the Secretary may determine is being used, or is intended for use, for . . . exhibition purposes." 7 U.S.C. § 2132(g) (1970).

Birds, rats and mice are all warm-blooded animals.  Yet in its initial implementing regulations, the USDA determined that "animal" should be defined to exclude *all* birds, rats, and mice from coverage under the AWA—*i.e.*, despite being warm-blooded, such animals were not considered by the USDA to be "animals" subject to the Act.  *See* Animal and Plant Health Service, Miscellaneous Amendments to Chapter, 36 Fed. Reg. 24,917, 24,919 (Dec. 24, 1971).  Some thirty years later, in 2002, Congress amended the AWA's statutory definition of covered "animals."  The new definition, operative to this day, still includes warm-blooded animals but now expressly "excludes . . . birds, rats of the genus Rattus, and mice of the genus Mus, bred for use in research." 7 U.S.C. § 2132(g).[2]  Under this current definition, while birds "bred for use in research" are not

---

[2] The full definition is as follows: "The term 'animal' means any live or dead dog, cat, monkey (nonhuman primate mammal), guinea pig, hamster, rabbit, or such other warm-blooded animal, as the Secretary may determine is being used, or is intended for use, for research, testing,

covered animals, all other birds are indisputably covered by the AWA.  Thus, this definition provides protection under the AWA to birds used in regulated activities, including birds used in exhibition, sold by commercial dealers, and those birds used in research but not bred for such use.

In order to accomplish Congress' purpose, the AWA requires the USDA to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors."  7 U.S.C. § 2143.  The AWA also directs the USDA to inspect and investigate for potential violations of these standards.  *See id.* § 2146.  It further establishes a system of licensure, registration, and initial inspection for compliance.  *See, e.g.*, 7 U.S.C. §§ 2133, 2136.

Two years after Congress amended the statutory definition of "animal," in 2004, in order to make the definition of "animal" in the AWA regulations consistent with the amended statutory definition, the USDA amended its regulations[3] "by narrowing the scope of the exclusion for birds

experimentation, or exhibition purposes, or as a pet; but such term excludes (1) birds, rats of the genus Rattus, and mice of the genus Mus, bred for use in research, (2) horses not used for research purposes, and (3) other farm animals, such as, but not limited to livestock or poultry, used or intended for use as food or fiber, or livestock or poultry used or intended for use for improving animal nutrition, breeding, management, or production efficiency, or for improving the quality of food or fiber. With respect to a dog, the term means all dogs including those used for hunting, security, or breeding purposes."  7 U.S.C. § 2132(g).

[3] Even before Congress amended the definition of "animal" in 2002 to clearly include birds not bred for use in research—thus requiring USDA to protect them via regulations—USDA had unequivocally confirmed that the AWA applied to birds and promised to enact regulations applicable to birds.  An animal welfare organization, along with a corporation and individual, filed a lawsuit challenging the USDA's exclusion of all birds, as well as rats and mice bred for use in research, from coverage under the AWA.  *See generally Alterns. Research & Dev. Found. v. Glickman*, 101 F. Supp. 2d 7 (D.D.C. 2000).  The district court noted that the USDA "ha[d] consistently refused to regulate these animals since 1970," *id.* at 16, and the parties entered into a settlement agreement.  In that 2000 agreement, the USDA promised to "initiate and complete a rulemaking on the regulation of birds, rats[,] and mice within a reasonable time in accordance with the Administrative Procedure Act and other applicable regulations."  Am. Compl. ¶ 63.

to only those birds bred for use in research."  USDA, Animal Welfare; Definition of Animal, Final Rule, 69 Fed. Reg. 31,513 (June 4, 2004); *see also* 9 C.F.R. § 1.1.[4]  On the same day, the USDA also published an Advance Notice of Proposed Rulemaking, notifying the public that it intended to "develo[p] appropriate standards for birds" not bred for use in research.  USDA, Animal Welfare Act Regulations and Standards for Birds, Rats, and Mice, Advance Notice of Proposed Rulemaking and Request for Comments, 69 Fed. Reg. 31,537-38 (June 4, 2004).

The USDA also stated at that time, and has repeatedly reaffirmed, that its "general" animal welfare standards, 9 C.F.R. §§ 3.125–3.142, do *not* apply to birds, and that only "bird-specific" standards[5] would be used for oversight and inspection of entities involved with birds that were covered by the AWA.  The USDA informed the public that it "d[id] not believe that the general standards . . . would be appropriate or adequate to provide for the humane handling, care, treatment, and transportation of birds."  69 Fed. Reg. 31,539.  Recognizing its obligation to comply with its statutory mandate to enact regulations, the USDA further informed the public that "before [it could] begin enforcing the AWA with respect to . . . birds," the USDA would need to consider bird-specific regulations.  *See id.* at 31,538-39.  Therefore, it sought public comment for the purpose of publishing a proposed rule in the Federal Register.  *Id.* at 31,539.

In response to the USDA's solicitation for comments earlier that year, on November 1, 2004, plaintiffs AAVS and AWC, and other animal welfare organizations, submitted joint

---

[4] Closely mirroring the statutory definition, the regulatory definition of an animal is: "any live or dead dog, cat, nonhuman primate, guinea pig, hamster, rabbit, or any other warmblooded animal, which is being used, or is intended for use for research, teaching, testing, experimentation, or exhibition purposes, or as a pet. This term excludes birds, rats of the genus Rattus, and mice of the genus Mus, bred for use in research . . . ."  9 C.F.R. § 1.1.

[5] The USDA has promulgated specific standards for other certain species of covered animals, including dogs, cats, rabbits, hamsters, guinea pigs, nonhuman primates, and marine mammals.  See 9 C.F.R. §§ 3.1–3.118.

comments to the Agency in support of proposed specific regulations for birds, rats, and mice not bred for research.  As part of the comments, the organizations prepared and submitted a forty-two page set of recommendations for regulations of birds under the AWA.  Am. Compl. ¶ 59.  Although the comment period for the Advance Notice of Proposed Rulemaking for birds closed on *November 1, 2004*, the USDA has to date not taken any substantive actions to enact specific regulations governing birds; it has not even published *proposed* regulations.  Instead, the USDA has expressly adopted a general position that it cannot act to protect birds or investigate situations involving the mistreatment of birds because they are not regulated under the AWA, and has repeatedly broken promises to enact bird-specific regulations.

In a brazen abdication of its obligations under the statute, the USDA has repeatedly set, missed, and reset deadlines for publishing bird-specific regulations, all the while affirming that none of the current regulations apply to birds.  On March 23, 2005, the USDA convened an Animal Welfare Stakeholder Meeting where Sue Leary, AAVS' President, reiterated the need for the agency to propose regulations to bring birds within the AWA's protection.  Am. Compl. ¶ 66.  On October 31, 2005, the USDA published a Statement of Regulatory Priorities, identifying bird-specific regulations as a regulatory priority and stating its intention to publish proposed bird-specific regulations by September 2006.   Unified Agenda, USDA, Statement of Regulatory Priorities, 70 Fed. Reg. 64,097, 64,104 (Oct. 31, 2005).  Several months before this self-imposed deadline, on March 16, 2006, the USDA convened another Animal Welfare Stakeholder Meeting where it stated that it was having difficulty determining the number of entities that would be covered by bringing birds not bred for use in research within the protection of the AWA.  Am. Compl. ¶ 68.  The Agency also stated that it planned on hiring an Avian Specialist to help develop bird-specific regulations.  *Id.*

The next year, USDA again made promises that it never kept.  On December 11, 2006, the Agency published another Statement of Regulatory Priorities, identifying bird-specific regulations as a regulatory priority for 2007.  USDA, Statement of Regulatory Priorities, 71 Fed. Reg. 72,736, 72,738 (Dec. 11, 2006).        And on April 30, 2007, the USDA published another statement in the Federal Register reporting that it intended to promulgate bird-specific regulations and indicated that such standards would be proposed by February 2008.  Unified Agenda, USDA, 72 Fed. Reg. 22,266, 22,266 (Apr. 30, 2007).  On May 15, 2007, the USDA convened another Animal Welfare Stakeholder Meeting and reiterated that bird-specific regulations were a top priority for the agency in 2007.  Am. Compl. ¶ 71.  Chester Gipson, APHIS' Deputy Director, announced that bird-specific regulations *had been drafted* and were awaiting clearance from the Agency.  *Id.*  At that May 2007 meeting, Dr. Gipson stated that the bird-specific regulations would be cleared by the Agency by the end of that month, and stated that the proposed regulations would then undergo a legal review by the USDA's Office of General Counsel (OGC), were scheduled for publication by the end of 2007, and would include a 60-day comment period.  *Id.* ¶ 72.

But, as it had been for years, in 2007 the USDA was yet again in violation of its mandate from Congress.  On December 10, 2007, the USDA published another Statement of Regulatory Priorities, identifying bird-specific regulations as a regulatory priority for 2008.  Unified Agenda, USDA, Statement of Regulatory Priorities, 72 Fed. Reg. 69,755, 69,757 (Dec. 10, 2007).  On May 5, 2008, the Agency published yet another statement in the Federal Register stating that it intended to prepare bird-specific regulations and indicated that such standards would be out by September 2008.  Unified Agenda, USDA, 73 Fed. Reg. 24,640, 24,640 (May 5, 2008).  At a July 23, 2008, Animal Welfare Stakeholders Meeting, the USDA stated that bird-specific regulations were still in the process of review by the agency's OGC—despite its prior claim in May of 2007 that the

OGC's review would be completed by the end of that month, over fourteen months earlier.  Am. Compl. ¶ 75.

Perhaps to cover its refusal to follow the requirements of the AWA, each year the Agency acted as if it was on the verge of enacting bird-related regulations.  On November 24, 2008, the Agency published its Statement of Regulatory Priorities for 2009, again identifying bird-specific regulations as a regulatory priority for coming year.  Unified Agenda, USDA, Statement of Regulatory Priorities, 73 Fed. Reg. 71,112, 71,117 (Nov. 24, 2008).  At the March 10, 2009, USDA Animal Welfare Stakeholders Meeting, the same USDA official stated that there was a temporary freeze on all regulations for approximately one month, but stated that bird-specific regulations had been approved by the Agency's OGC and were now with the Office of Management and Budget (OMB) for a cost-benefit analysis to determine the effect on small entities.  Am. Compl. ¶ 77.  The official estimated that OMB's review would take 90 days.  Ms. Leary asked whether it would be reasonable to expect proposed regulations by September or October of 2009.  The USDA official said that was possible.  *Id.*

The Agency's continued reassurances demonstrate its clear conviction that it was required to enact regulations that apply to birds.  On May 11, 2009, the USDA published another statement in the Federal Register indicating its intention to promulgate bird-specific regulations, and indicated that such standards would be proposed by November 2009.  Unified Agenda, USDA, 74 Fed. Reg. 21,873, 21,873 (May 11, 2009).  Having missed yet another of its own deadlines to publish regulations that applied to birds, on December 7, 2009, the USDA repeated its longstanding pattern and once again issued a statement in the Federal Register reiterating its promise to promulgate bird-specific regulations and indicated that such standards would be proposed by January 2010.  74 Fed. Reg. 64,149 (Dec. 7, 2009).  At the March 10, 2010, Animal

Welfare Stakeholders Meeting, the USDA stated that bird-specific regulations were scheduled for release in August 2010, with a 90-day comment period.  The Agency also stated that it would not be proposing specific standards for rats and mice and would continue to regulate rats, and mice under the general standards.  Am. Compl. ¶ 80.

At this point, the USDA had been providing annual guarantees of its commitment to have the AWA regulations for birds not bred for use in research finished, even though no such action ever (to this day) took place.  On April 26, 2010, the Agency again reiterated the August 2010 date for proposed bird-specific regulations by publishing that deadline in the Federal Register.  Unified Agenda, USDA, 75 Fed. Reg. 21,736, 21,736 (Apr. 26, 2010).  As with each of the other deadlines, August 2010 came and went without any proposed standards being published.  In the USDA's Statement of Regulatory priorities for 2011 published on December 20, 2010, the agency identified bird-specific regulations as a regulatory priority and indicated standards would be proposed by August 2011.  Unified Agenda, USDA, Statement of Regulatory Priorities, 75 Fed. Reg. 79,467, 79,474, 79,469 (Dec. 20, 2010).  At the April 26, 2011, USDA Animal Welfare Stakeholders Meeting, Dr. Johanna Briscoe, the Avian Specialist for the Agency, stated that the USDA was "reassessing" the information it had gathered in connection with issuing bird-specific regulations.  Am. Compl. ¶ 83.

The Agency reconfirmed its recognition that it had to have regulations that applied to birds on July 7, 2011, when it published a mid-year regulatory agenda in which it restated its intention to promulgate bird-specific regulations.  Unified Agenda, USDA, Semi-annual Regulatory Agenda, Spring 2011, 76 Fed. Reg. 39,998, 40,003 (July 7, 2011).  The following week, on July 12, 2011, OMB published a list of upcoming standards on its website, including a notice that it intended to publish proposed bird-specific standards on August 1, 2011, and providing that there

10

would be a 90-day comment period that opened when the regulations were published.  *See* Office of Information and Regulatory Affairs, Office of Management and Budget, Executive Office of the President, View Rule, available at: http://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201104&RIN=0579-AC02.

The proposed rules were not published on August 1, 2011.  Instead, in August 2011, the agency published a "Factsheet" stating that it anticipated release of the new regulations applicable to birds "during 2011," that comments would be taken, and that a final rule could be expected within one to two years after that.  Am. Compl. ¶ 86.  On September 15, 2011, Dr. Gipson of APHIS met with animal welfare advocates and stated that the proposed bird-specific regulations were not yet with OMB.  When the animal protection advocates asked if it would be another year before the regulations were proposed, he asserted that it would not take that long.  *Id.*¶ 87.

On February 13, 2012, the USDA again identified bird-specific regulations as a regulatory priority for 2012 and indicated that it would publish proposed bird-specific standards by May 2012. Introduction to the Unified Agenda of Federal Regulatory and Deregulatory Actions, 77 Fed. Reg. 7664, 7677-78, 7685 (Feb. 13, 2012).  On June 14, 2012, the USDA informed animal protection advocates that the regulations were in department clearance but had not yet been through OMB. Am. Compl. ¶ 89.

On January 8, 2013, the USDA again stated its intention to promulgate bird-specific regulations and indicated standards would be proposed by November 2013.  Unified Agenda, USDA, Semi-annual Regulatory Agenda, Fall 2012, 78 Fed. Reg. 1522, 1526 (Jan. 8, 2013).  At the May 1, 2013, Animal Welfare Stakeholder Meeting, a USDA official confirmed that the general AWA standards do not apply to birds, and that when the agency receives complaints about mistreatment of birds, it directs callers to local law enforcement authorities (because there were

no standards under which to apply the AWA's protections).  Am. Compl. ¶ 91.  On May 21, 2013, the USDA again informed animal welfare advocates that the regulations had still not been passed along to OMB for review.  *Id.* ¶ 92.

Despite the repeated confirmation of the Congressional mandate and agency charge to enact regulations that allowed the AWA to be applied to inhumane treatment of birds, and despite the surprising regularity of the statements and the fact that the USDA again missed its most-recently-stated deadline of November 2013, the Agency has not made any subsequent statement *in the last five years* regarding its intention to promulgate regulations applicable to birds or indicated a new deadline by which it would be doing so, and in that same time period it has never denied that there are no extant regulations that newly apply to birds.  Am. Compl. ¶ 93.

During this egregious delay that is rapidly approaching two decades, the USDA has consistently refused to apply the AWA to birds in any way, despite their clear coverage by the law. Indeed, the USDA does not even require exhibitors, breeders, or dealers of birds to obtain an AWA license to conduct activity involving birds that is clearly covered by the Act.  Am. Compl. ¶ 94. For almost twenty years, there has been no federal protection for birds covered by the AWA, despite a clear mandate and an admitted obligation to enact regulations.

## III.    ARGUMENT

### A.    <u>Legal Standards for Motions to Dismiss Under Rules 12(b)(1) and 12(b)(6)</u>

In evaluating a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), the Court must "treat the complaint's factual allegations as true."  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation and quotation omitted). Further, "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the

subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."  *Walker v. Jones*, 733 F.2d 923, 925–26 (D.C. Cir. 1984).

To survive a motion to dismiss under Rule 12(b)(1), Plaintiffs bear the burden of proving that the Court has subject-matter jurisdiction to hear its claims.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Rule 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted."   The Supreme Court has cautioned that "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), though "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  A complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

## B.    Each Plaintiff has standing and dismissal is therefore not warranted under Rule 12(b)(1).

"'There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.'"  *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).  In determining whether an organization or association has standing, a court "conduct[s] the same inquiry as in the case of an individual: Has the plaintiff alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction?"  *Havens Realty Corp. v. Coleman*, 455 U.S. 377, 378-79 (1982) (citations and quotation marks omitted).  To have standing, an organization "must have suffered a concrete and demonstrable injury to its activities."  *Food &*

13

*Water Watch v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (internal punctuation and citation omitted).

Article III's requirement of standing requires a showing "that the litigant has suffered a concrete and particularized injury that is actual or imminent, traceable to the challenged act, and redressable by the court." *Abigail Alliance*, 469 F.3d at 132 (citations omitted). "The central question . . . in an organization standing case" is focused on the first of these factors, and asks "whether the plaintiff has suffered a concrete and demonstrable injury to its activities, mindful that, under [this Court's] precedent, a mere setback to its abstract social interests is not sufficient." *Environmental Working Group v. U.S. Food and Drug Administration*, 301 F. Supp. 3d 165, 170-71 (D.D.C. 2018). Despite the government's arguments to the contrary here, AWC and AAVS each independently satisfy the requirements for organizational standing.[6]

Defendants devote a great number of pages to a misplaced discussion of the standing discussion in the *PETA* litigation. Of course, the plaintiff's injuries alleged in that case are not the only available means by which an organization can demonstrate standing. Nonetheless, because there are material similarities, some aspects of *PETA II* actually demonstrate Plaintiffs' standing here. But more importantly, Plaintiffs also allege claims and injuries that are unique to this case, providing additional bases for standing under relevant precedent.

---

[6] Defendants argue that AAVS and AWC base their standing on "lobbying activities," such as their efforts at meeting with the USDA to attempt to persuade it to enact regulations protective of birds. Mot. at 10-12. These arguments are misplaced and attack portions of the complaint largely unrelated to standing. That is, Plaintiffs do not dispute the *principle* that the expenditure of resources for pure lobbying activities do not satisfy Article III's injury requirement. *See, e.g.*, *Food and Water Watch*, 808 F.3d at 919 (holding that "organization's use of resources or litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury"). But Plaintiffs only included those facts in their complaint because they form part of the factual history of this case—not as a basis for their standing. Those details show, for instance, the basis of Plaintiffs' knowledge and allegations of USDA's conduct over the years for purposes of their claims.

### 1.   Avian Welfare Coalition ("AWC")

AWC is a working alliance dedicated to the ethical treatment of captive birds, and is based in St. Paul, Minnesota.  Am. Compl. ¶ 28.  Its mission is to protect and raise awareness about the plight of captive birds, and to serve as an educational resource for the humane community, lawmakers, and the general public.  *Id.* ¶ 29.

There are several ways in which USDA's failure to act has "perceptibly impaired" AWC's activities, therefore causing AWC Article III injury.  *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015).  As described in the Amended Complaint, AWC has undertaken a significant shift in its organizational activities as a direct result of USDA's unlawful failure to publish regulations covering birds under the AWA.  AWC was founded in 2000, shortly before Congress amended the AWA to indisputably cover birds.  Am. Compl. ¶ 28.  When it became apparent that USDA was not enacting regulations that would be applicable to and protect birds, however, AWC was compelled to divert resources and engage in the development of educational and training materials regarding the humane treatment of birds.  *Id.* ¶ 34.  This was done because of the agency's failures challenged in this lawsuit, so that AWC could improve the welfare of birds in shelters and other facilities.  *Id.* ¶ 34.  In AWC's experience of working with entities housing birds over the years, many such entities are more likely to treat birds humanely where applicable regulations exist, as those entities would seek to comply with such regulations.  *Id.* ¶ 32.  However, because of the absence of federal regulations governing birds, AWC believed it necessary to redirect its resources and refocus its activities to educate those entities so that the humane treatment of birds would increase.  *Id.* ¶¶ 32-34.

The materials that AWC has devoted significant portions of its limited resources to develop as a direct result of USDA's inactions are detailed in the Amended Complaint, and include "How-

To Guides for Bird Shelters and Care Facilities," a series of webinars for bird shelters and other facilities that provide training to animal care professionals on the specialized care of exotic birds, and a webinar and brochure for the Association of Prosecuting Attorneys designed to help prosecutors identify bird cruelty, abuse and neglect. *Id.* ¶¶ 34-37.

This work alone satisfies D.C. Circuit standing precedent for organizational standing, because all of these efforts "were not part of AWC's normal annual expenditures until the efforts became necessary due to USDA's clear inaction." *Id.* ¶ 39. Thus, AWC has demonstrated both causation and injury pursuant to the "two-part inquiry" applicable to organizational plaintiffs, which asks "first, whether the agency's action or omission to act injured the [organization's] interest and second, whether the organization used its resources to counter that harm." *Food & Water Watch, Inc.*, 808 F.3d at 919. AWC has also sufficiently alleged redressability, as it has specifically and plausibly stated that if the USDA were to enact applicable regulations, it would— as it did before it became apparent that the USDA was failing to act—devote its resources to different organizational activities, focused on other aspects of its work, such as responding directly to reports of bird cruelty and to protecting birds that are not covered by the AWA (birds bred for use in research). Am. Compl. ¶¶ 39, 46.

In its Motion, Defendants raise two responses regarding this injury to AWC. First and primarily, they claim that there is no injury in fact because AWC only "assume[s] that they would no longer provide assistance or training resources absent USDA regulations about birds, and that these costs are thus caused by USDA's inactivity." Mot. at 12. By even making this argument, Defendants signal to the Court that they want to argue the entire case now, at the pleadings stage and prior to review of the administrative record, by trying to dispute Plaintiffs' clear and plausible factual allegations and arguing that the Court should let Defendants tell the Court what Plaintiffs

16

"assume."  This is an invalid argument on a 12(b)(6) motion, as it baldly ignores the allegations in the Amended Complaint, and fails to accept as true the plausible allegations there, contrary to bedrock principles of procedure for the motion to dismiss stage.  *See Abigail Alliance*, 469 F.3d at 132 ("At each stage of trial, the party invoking the court's jurisdiction must establish the predicates for standing with the manner and degree of evidence required at that stage of the trial." (internal quotations omitted)).

The government's arguments are based on its own unsupported speculation.  It asserts that AWC's activities described above would not "necessarily become irrelevant" if the USDA issued regulations that protected birds.  Further, the government conjectures that AWC's activities would "presumably be necessary regardless of any regulatory scheme."  Mot. at 13.  But a defendant does not get to put his own speculative spin on a complaint in order to distort a plaintiff's standing allegations, especially where "the allegations of the complaint should be construed favorably to the pleader."  *Walker v. Jones*, 733 F.2d 923, 925–26 (D.C. Cir. 1984).

In the Amended Complaint, AWC described and specifically alleged that it did not engage in these activities before it recognized that USDA was going to shirk its duties, and that it would not continue to do so if USDA enacted regulations because entities such as shelters, in AWC's experience, would comply with these regulations.  Am. Compl. ¶¶ 34-38.  AWC further alleged that if regulations are passed, it will return to other projects that have been ignored because of the Agency's failure, and that AWC's limited resources would, in its judgment, best be devoted to different activities, such as responding to specific complaints of bird cruelty.  *Id.* ¶ 39.  The question is not whether or not the activities AWC alleges in the Amended Complaint would certainly be "necessary" if USDA enacted regulations applicable to birds.  The question is instead whether AWC has pled facts sufficient to show a "substantial likelihood" that its injury will be

17

redressed.  *Cause of Action Institute v. Tillerson*, 285 F. Supp. 3d 201, 205 (D.D.C. 2018).  AWC satisfies the Article III elements given its allegations that it only started engaging in these activities once USDA's failure to act became apparent, and that it would shift resources elsewhere—to other projects in order to carry out other aspects of its mission—if the agency published guidance on the treatment of covered birds.  Am. Compl. ¶¶ 34-39.  Because AWC's diversion of resources is based on the agency's failure to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors," 7 U.S.C. § 2143(a), AWC has easily satisfied its burden.

The sole case the government relies on in connection with this point, *Turlock Irrigation District v. FERC*, 786 F.3d 18, 24-25 (D.C. Cir. 2015), concerns a party basing standing on pure conjecture and a long chain of uncertainties: that if two irrigation districts are not licensed in a single proceeding, FERC will be unlikely to create a coordinated fish passage, which will lead to a decline in a fish populations, which will lead to a decrease in tourism revenue.  Nothing about the allegations in *Turlock Irrigation District* involved action that had already been taken, as here, in direct response to the challenged government conduct.  There is no conjecture whatsoever in AWC's claims that it (1) responded to Defendants' failure to enact regulations by diverting resources from other programs; and (2) would stop this diversion of resources for this purpose if Defendants did what they were required to and had promised.  AWC's standing is solidly based on its allegations that if USDA follows its statutory mandate to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals," 7 U.S.C. § 2143—regardless of the precise contours of those regulations—then AWC will return resources to different projects that have been sidelined because of its work alleged in the Amended Complaint and triggered because of USDA's failure to act.  *See PETA II*, 797 F.3d at 1096-97 (rejecting the government's

argument that a harm is self-inflicted and holding that standing exists where "PETA redirected its resources in response to USDA's allegedly unlawful failure to provide the means by which PETA would otherwise advance its mission").

The government's other argument is that AWC's activities constitute "educational advocacy," which it says does not constitute cognizable Article III injury. Mot. at 14-15. Whatever that term may mean in Defendants' minds, and however they wish to use it to deny AWC's standing, counsel is not aware of a court having put those two words together or suggested that devoting resources to education about how to protect animals amounts to the advocacy that is excluded from consideration for purposes of Article III. Nor does the notion make any sense, since education has been at the heart of cases granting plaintiffs standing. *See, e.g.*, *Abigail Alliance*, 469 F.3d at 133; *PETA II*, 797 F.3d at 1094-1095.

As a preliminary matter, the government provides no explanation as to how education for law enforcement and shelters about substantive issues surrounding mistreatment of birds turns into "advocacy" barred from Article III consideration. There is simply no basis for the government's suggestion that AWC's creation of training materials regarding the proper care of birds amounts to "advocacy" of any sort, such as before the USDA or Congress regarding legislation and regulation. And there certainly is no exception in Article III jurisprudence for activities that provide training to or educate third parties about substantive matters (as contrasted with the exception for lobbying and litigation activities). Rather, the diversion of resources to training and education can qualify as an injury just like any other concrete impact on an organization's activities.

The distinction between education, on the one hand, and "pure issue-advocacy," *PETA II*, 797 F.3d at 1094, like lawmaking/lobbying and litigation, on the other, is clear. And the line drawn

by the courts for conduct that is and is not excluded from consideration of the Article III injury-in-fact analysis is also well set out in case law. The D.C. Circuit has distinguished between the provision of "services," such as counseling to low-income individuals, and "*educat[ing]* the public about . . . legislation" that is the subject of the litigation, *National Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (emphasis added), or education about a "USDA inspection legend." *Food & Water Watch*, 808 F.3d at 921.[7] AWC's substantive provision of training materials regarding the care of birds to animal shelters is far more like a "service" than "education" addressing only the agency action or law that is the subject of the litigation. And to the extent it is "education," it is education stimulated by the agency's illegal conduct, but in no way directed at or discussing it.

*Food & Water Watch*, where plaintiffs were denied standing, also makes the instant Plaintiffs' standing clear. In that case, the court held that

> an organization does not suffer an injury in fact where it "expend[s] resources to educate its members and others" *unless doing so subjects the organization to "operational costs beyond those normally expended." National Taxpayers Union,* 68 F.3d 1428, 1434; *Nat'l Taxpayers Union, Inc.,* 68 F.3d at 1434; *see also Nat'l Ass'n of Home Builders v. EPA,* 667 F.3d 6, 12 (D.C. Cir. 2011) (organization's expenditures must be for "'operational costs beyond those normally expended' to carry out its advocacy mission") (citation omitted)).

*Food & Water Watch*, 808 F.3d at 920. As the decision makes clear, the diversion of resources to educational efforts suffices to show injury so long as it subjects an organization to "operational

---

[7] In other words, in *Food & Water Watch* the plaintiff organization based its standing in part on its claim that it would have to devote its efforts to education *about the subject of the litigation*. 808 F.3d at 920. By contrast, AWC's training and education is obviously not about the law or regulations at issue—particularly since no applicable regulations exist—and generally not about any aspect of the Animal Welfare Act. AWC's education is focused on how to take care of mistreated birds, and how to respond where birds are found in dangerous and unhealthy circumstances, an entirely different subject and focus area which AWC has undertaken only because of Defendants' failure to act. Am. Compl. ¶ 39.

costs beyond those normally expended." *National Taxpayers Union,* 68 F.3d at 1434.  Here, AWC makes just such an allegation, Am. Compl. ¶ 39, and additionally explains that its training "efforts were not part of AWC's normal annual expenditures until the efforts became necessary due to USDA's clear inaction." *Id.*  This is easily distinguishable from *National Taxpayers Union*, the case that first referenced this question, noting that there was no evidence that the plaintiff had expended resources on education about the challenged statutory provision that were additional to those it had already expended on ongoing education about similar legislation.  68 F.3d at 1434. *See also Envt'l Working Grp.*, 301 F. Supp. 3d at 172 (rejecting standing where plaintiffs did not allege expenditures constituting "operational costs *beyond those normally expended*").  It is likewise the dispositive difference with the allegations and the holdings in *Food & Water Watch* and *Environmental Working Group*, where plaintiffs did not claim that they utilized resources and shifted focus that they would not have done but for the challenged conduct.  *See, e.g.*, *Envt'l Working Grp.*, 301 F. Supp. 3d at 172 ("Neither do the Plaintiffs' educational efforts suffice, because this type of work is exactly what these organizations always do.").

In addition to the training and informational materials just discussed, AWC also alleged that it suffered injury because in advising and assisting individuals who want to take action regarding observed bird abuse, AWC has to expend resources that it would not otherwise utilize in order to refer to and track "the patchwork of varying laws that apply across the fifty states." Am. Compl. ¶ 40.  And it must do this specifically because it is unable to rely on comprehensive federal regulation or to refer these calls to the USDA.  Am. Compl. ¶ 41.  The latter allegation is virtually indistinguishable from the *PETA* litigation, where the D.C. Circuit found standing because the plaintiff asserted that "the USDA's allegedly unlawful failure to apply the AWA's general animal welfare regulations to birds has 'perceptibly impaired [PETA's] ability' to . . . bring

AWA violations to the attention of the agency charged with preventing avian cruelty and continue to educate the public." *PETA II*, 797 F.3d at 1095.  As to AWC's allegation regarding tracking fifty regulations rather than one, the government contends that this type of injury was disallowed by *Center for Law and Education*, but the court there rejected the plaintiff's claim only because the asserted injury "ar[ose] from the effect of the regulations on the organizations' lobbying activities."  396 F.3d at 1161.  Here, AWC alleges that it is advising individuals who have witnessed bird abuse on a state-by-state basis, not that it is lobbying for legislation or policy change on a state-by-state basis.

The government's final and unavailing argument with respect to standing is that AWC cannot demonstrate redressability because the AWA does not preempt state regulations.  Mot. at 16 n.7.  But the injury AWC alleges occurs because of the lack of *federal* regulation under the AWA.  The fact that there may be state regulation that is complementary to the AWA is irrelevant to the issue before the Court.  The potential for state protection does not change the fact that AWC has adequately alleged that if it is granted relief, its injuries to its interest can be redressed, and that the impact on its resources will be alleviated, by the enactment of federal regulations to which it can direct the entities it counsels.  State regulation do not impact AWC's assertion that it would benefit, and have less need to engage in these efforts, if federal regulations were in place.

### 2.    American Anti-Vivisection Society ("AAVS")

AAVS was founded in 1883 and is the oldest non-profit animal welfare organization in the United States dedicated to ending experimentation on animals in science, including research, testing, and education.  Am. Compl. ¶ 10.  Its initiatives have included promoting and seeking alternatives to the use of animals in science and society, and it also works to end other forms of cruelty to animals, such as mistreatment in agriculture, entertainment, and other areas.  *Id.* ¶ 12.

Its primary objectives include supporting strong animal protective legislation, increasing public awareness about the treatment of animals, and humane education.  *Id.* ¶ 10.

Like AWC, AAVS has also demonstrated that it has "suffered a concrete and demonstrable injury to its activities."  First, the Amended Complaint explains that "[o]ne of AAVS' focal functions is the collection and provision of information regarding the condition of animals in regulated facilities."  *Id.* ¶ 17.  Every year, AAVS sends a report to its members that is based on USDA's reports with respect to AWA-covered animals.  However, because the USDA has not regulated birds, a significant portion of the animal species used in research (whether or not bred for that purpose), *id.* ¶ 25, AAVS has not been able to cover birds in this report.  *Id.* ¶ 17.  Similarly, because of USDA's absence of regulations, AAVS is unable to request and obtain reports under the Freedom of Information Act that would enable it, for example, to determine if birds not bred for use in research were used in toxicology testing, and then target its efforts at improving the lives of those animals.  *Id.* ¶ 21.  Because AAVS is deprived of this type of information as to birds, which it depends on for other animals covered by the USDA, AAVS has had to spend its resources on other means to fulfill its mission with respect to birds, such as the publication of special reports and the attendance at meetings discussing the use of birds in commercial activities.  *Id.* ¶ 23.

The D.C. Circuit has held that this exact type of injury is sufficient to confer standing.  In *PETA II*, the plaintiff had alleged that one of the primary ways it accomplishes its mission is "educating the public by providing information about the conditions of animals held by particular exhibitors," and that "USDA's refusal to apply the AWA to birds . . . deprived PETA of key information that it relies on to educate the public."  797 F.3d at 1094-1095 (internal quotations omitted).  The court held that the "denial of access to bird-related AWA information including, in particular, investigatory information" is a cognizable injury to support standing.  *Id.*  Here, the

government contends (despite the D.C. Circuit's clear holding) that this is insufficient to confer standing because AAVS does not "have a right" to the information it seeks.  Mot. at 17.  But this argument is unsupportable in light of the decision in *PETA II*, which concerned the same statutory scheme at issue here, particularly where AAVS alleges that the USDA does in fact provide such information as to other animals covered by the AWA.  Am. Compl. ¶¶ 17-21.  The government also contends that this sort of injury is irrelevant here because Plaintiffs do not challenge USDA's failure to enforce the AWA but only its failure to enact regulations in accordance with the AWA's mandate to protect birds.  Of course, it would be premature to argue that USDA is required to enforce before it regulates, and in any event where the statute obligates the USDA to administer and enforce its regulations, 7 U.S.C. § 2146, there is a "substantial likelihood" that a favorable result in this litigation would address AAVS' injury.  *Cause of Action Institute*, 285 F. Supp. 3d at 205.  In fact, that the government would argue that there is no standing because it cannot be presumed that it will follow the law is somewhat incredible.

## C.     Plaintiffs have stated a claim that Defendants have failed to act in violation of their statutory obligations.

Plaintiffs have sufficiently pled cognizable claims for relief under both Sections 706(1) and 706(2) of the APA.  "[A]ccording to the plain terms of APA, 'failures to act' fall under the scope of *both* § 706(1) and § 706(2)."  *Alliance to Save Mattaponi v. U.S. Army Corps of Engineers*, 515 F. Supp. 2d 1, 10 (D.D.C. 2007).  First, Section 706(1) provides that a court may "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  The AWA states in mandatory language that the USDA is obligated to enact regulations governing the humane treatment of covered animals, 7 U.S.C. § 2143(a)(1), and that such animals include birds not bred for use in research, *id.* § 2132(g).  The government does not dispute this, but misreads the Amended Complaint to demand the enactment of certain regulations specific to birds, relief that

was rejected in *PETA I*.  In fact, Plaintiffs do not demand the enactment of bird-specific regulations, but instead demand nothing more than what the statute requires: that the USDA enact regulations that govern the humane treatment of birds—something the USDA has agreed it is required to do.  By its own repeated admissions, the USDA has effectively admitted its obligation. Through its interpretation of its own regulations—to which this Court must defer—it concedes there are no regulations covering birds (and there never have been).  Thus, it has failed to—and at the least unreasonably delayed—the enactment of those regulations.  Thus, Plaintiffs have pled a viable claim under Section 706(1).

Second, Section 706(2) provides that a court can review agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A). The government's tactic here is to create a wall protecting it from liability for its illegal action, and failure to enact regulations, by making the circular argument that somehow its failure to comply with its statutory mandate actually insulates it from challenge to its failure to comply with its statutory mandate.  If Defendants are right, the agency can go on forever shirking its role as the protector of birds, and avoid any reprimand by the courts.  But where an agency has made clear that it has decided not to regulate, as it has done here by its persistent refusal to do so, and where that decision alters the legal landscape for regulated parties, as it has done so here, Plaintiffs have pled a cognizable claim.

Though the government makes great efforts to characterize Plaintiffs' claims as identical to those in the prior *PETA* litigation, it elides critical differences and features of that litigation. First, the district court's holding with respect to PETA's failure to enact regulations claim was not appealed, and there is thus no binding decision in that regard.  Second, the district court did not even analyze PETA's claim under Section 706(2) because it found the plaintiff had waived it by

25

raising it only in their briefing but not stating such a claim in its complaint.  Third, as to the Section 706(1) claim, PETA requested the sole relief that the court order the agency to enact bird-specific regulations, running afoul of the principle that a court may not dictate to an agency *how* to fulfill its statutory obligation.  Plaintiffs have not done that here.  Rather, Plaintiffs have framed their claim for relief as simply what the statute demands: nothing more, nothing less.  Finally, additional facts have come to light since the PETA litigation, including the passage of an additional five years, further inaction and silence from the USDA during that time, and a recent GAO report outlining the USDA's continued approach refusing to protect birds.

### 1.    Section 706(1) of the APA

Section 706(1) is designed to provide a remedy to address precisely what USDA has done (or failed to do) here.  The provision "rightly avoids a scenario in which 'agencies could effectively prevent judicial review of their policy determinations by simply refusing to take final action.'" *Center for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017) (quoting *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001)).  Despite the AWA's clear and undisputed statutory mandate to enact regulations that protect birds, the USDA has failed to fulfill this imperative for over fifteen years.  The government's arguments are not to the contrary; that is, it never denies, and effectively admits that there are no regulations covering birds.  Ignoring that essential point, Defendants in their Motion make arguments based primarily on their apparent over-eagerness to equate Plaintiffs' claims to those raised by the plaintiff in *PETA*.  In fact, Plaintiffs' claims here are critically different.  Because Plaintiffs ask this Court to do nothing other than have Defendants satisfy their clear statutory duty, they have stated a cognizable claim under the APA's failure-to-act provision.

Section 706(1) provides that a court shall "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  The Supreme Court has held that a claim of agency inaction under this provision must meet two fundamental requirements, and is viable "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004).  Plaintiffs' Amended Complaint easily satisfies both prerequisites.  First, the discreteness requirement is designed to preclude a "broad programmatic attack" on an agency's activities.  *Id.*  This requirement is no bar to Plaintiffs' claim, which seeks to compel the USDA to take the concrete and specific action of enacting regulations required by 7 U.S.C. § 2143 that apply to birds. "Plaintiffs are not seeking wholesale change to an entire federal program," and "[n]or are they requesting that this Court inject itself into the day-to-day agency management."  *Ramirez v. U.S. Immigration and Customs Enforcement*, 310 F. Supp. 3d 7, 20 (D.D.C. 2018).  *See also Norton*, 542 U.S. at 63 (noting that Section 706(1) applies to "the failure to promulgate a rule").  Plaintiffs simply seek judicial intervention to force the agency's hand to do what it is required to do, since it refuses to act.

In any event, the government's Motion does not dispute the satisfaction of the discreteness requirement, but only the second requirement, contending that Plaintiffs have failed to point to an action that the USDA is "required to take."  Mot. at 23.  However, the AWA subjects the USDA to a clear duty to enact regulations that protect covered animals, and such animals have included birds not bred for use in research since at least 2002.  *PETA I*, 7 F. Supp. 3d at 4 (noting that in 2002 "Congress amended the Animal Welfare Act to include birds as creatures deserving of legal protection").  The relevant provision of the AWA is couched in mandatory terms, as evidenced by its repeated use of the word "shall."  *Sierra Club v. Jackson,* 648 F.3d 848, 856 (D.C. Cir. 2011) ("As we have repeatedly noted, 'shall' is usually interpreted as 'the language of command.'").

And 7 U.S.C. § 2143(a) plainly states that "[t]he Secretary shall promulgate standards to govern the humane handling, care, treatment, and transportation of animals."  It then sets forth a list of what these mandatory standards "shall" include, such as "minimum requirements for handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperatures," *id*. § 2143(a)(2), and certain requirements "with respect to animals in research facilities." *Id.* § 2143(a)(3).  That simple statement of requirements, written directly into the statute at issue, is USDA's obligation, and Plaintiffs simply seek to have the agency meet that obligation after fifteen years of delay.

In the face of this statutory language, the government asserts that Plaintiffs here seek to tell the agency exactly what it must prepare, that is, that they ask this Court to require the USDA to issue "avian-specific" regulations, just like the plaintiff in *PETA I*.  Not so.  In *PETA I*, the court held—in agreement with Plaintiffs here—that the Agency *was compelled by law* to "promulgate regulations applicable to birds," *i.e.*, regulations that govern and ensure the humane handling, care, treatment and transportation of birds.  *PETA I*, 7 F. Supp. 3d at 14 ("statute simply directs the agency to promulgate standards…"); Am. Compl. ¶¶ 24-25.  Congress required that.  Judge Boasberg agreed with the mandatory duty USDA has, and only rejected PETA's claim because PETA was demanding that the court tell the Agency exactly what it must do--"issue avian-specific animal welfare regulations" *PETA I*, 7 F. Supp. 3d at 14—as opposed to asking the court to compel the agency to do what was required.  It is the latter ruling that Plaintiffs seek here.  And as discussed in more detail below, the Agency has admitted the one thing that makes the ruling requested by Plaintiffs here fit directly within this Court's authority under Section 706(1): the Agency has

repeatedly stated and acknowledged that there are *no regulations currently extant that cover birds*.[8] So the statute, and Judge Boasberg in *PETA I*, recognize the agency's mandatory duty to promulgate regulations. And the Agency admits it has not done so. The only remaining question is whether over fifteen years of delay is unreasonable.

Plaintiffs' Amended Complaint clearly avoids the criticism of PETA's claim, as well as the arguments of Defendants here, by leaving the decision up to the Agency as to what regulations apply to birds, as long as some regulations do so. Plaintiffs' complaint is not directed at telling the agency to do anything other than what all agree it is required to do: have, in the Code of Federal Regulations, rules that govern the treatment of birds, address what happens when birds covered by the AWA are abused or mistreated, and provides guidance to all entities engaged in the commercial handling of birds to the extent that handling and those birds are covered by the AWA.

There is no question that currently, and for the last sixteen years and beyond, there have been no regulations governing the treatment of birds covered by the AWA. The USDA has unfailingly interpreted its own general animal welfare regulations, 9 C.F.R. §§ 3.125-3.142, as *not* applying to birds. Am. Compl. ¶¶ 57-100. Indeed, although it has largely mirrored the AWA's statutory definition of animals since 2004, 69 Fed. Reg. 31,513 (June 4, 2004), 9 C.F.R. § 1.1, it has consistently taken the position in a variety of arenas that its existing general regulations do not

---

[8] Unlike the plaintiff in the *PETA* litigation, Plaintiffs do not demand the relief that Defendants enact bird-specific regulations; rather, it is Defendants who have suggested that as a method of compliance. But Defendants could grant Plaintiffs the relief they seek in this suit in a number of ways, which could include bird-specific regulations or reversing its position that its own existing regulations do not apply to birds. *PETA I* is also distinguishable because it did not consider the traditional deference to the agency's interpretation of its own regulations, and because the passage of another five years since the decision of that case demonstrates the further cementation of the agency's failure to act. In any event, the failure-to-act aspect of the district court's ruling was not appealed and thus not affirmed by the D.C. Circuit, and thus is not binding on this court.

apply to birds.  For instance, a report by the GAO released in May of this year found that APHIS officials "said that until the agency has defined birds covered by the act, they do not believe that it is appropriate to require research facilities to report their use of birds."  Thus, "APHIS instructs facilities to not report any birds in their annual reports, regardless of whether they were bred for use in research [and thus are covered by the AWA's definition of 'animal']."  GAO, *Animal Use in Federal Research*, GAO 18-459 at 13 (May 2018), *available at* https://www.gao.gov/products/GAO-18-459.  *See also, e.g.*, Am. Compl. ¶ 94 (alleging that the USDA "does not even require exhibitors, breeders, or dealers of birds to obtain an AWA license to conduct activity that is clearly covered by the Act"); *id.* ¶ 100 (alleging that the USDA, in response to a complaint that fifteen parrots died in a fire, issued a memorandum stating that birds "are not a regulated species and DO NOT FALL UNDER USDA REGULATION").

Defendants have repeated and insisted that there are no regulations covering birds who come under the AWA's purview.  In Advanced Notices of Proposed Rulemakings and other documents published in the Federal Register, it has confirmed that none of the current regulations are "appropriate or adequate to provide for the humane handling, care, treatment, and transportation of birds."  USDA, Animal Welfare Act Regulations and Standards for Birds, Rats, and Mice, Advance Notice of Proposed Rulemaking and Request for Comments, 69 Fed. Reg. 31,539 (June 4, 2004).  In a further confession of its failings to protect birds as it must, the Agency has therefore "solicit[ed] comments from the public to aid in the development of appropriate standards for birds not specifically excluded from coverage under the AWA."  *Id.* at 31,537-38. Indeed, it went on to state that it was reviewing the definitional section of the regulations and regulations pertaining to research facilities "to determine if any changes are necessary *before we can regulate* the care and use of birds not specifically bred for use in research."  *Id.* (emphasis

added).  Nine years later, in 2013, the agency stated that it "intends to *establish standards* for the humane handling, care, treatment, and transportation of birds other than birds bred for use in research."  USDA, Semiannual Regulatory Agenda, Fall 2012, 78 Fed. Reg. 1522-01 (Jan. 8, 2013) (emphasis added).  It has made similar or identical statements in the intervening years, yet has taken no action.  *See also, e.g.*, 78 Fed. Reg. 1,522, 1,526 (July 7, 2011) ("APHIS intends to establish standards for the humane handling, care, treatment, and transportation of birds other than birds bred for use in research."); 76 Fed. Reg. 39,998, 40,003 (July 7, 2011); 75 Fed. Reg. 21,736, 21,736 (Apr. 26, 2010); 74 Fed. Reg. 21,873, 21, 873 (May 11, 2009); 73 Fed. Reg. 71,112, 71,117 (Nov. 24, 2008); 72 Fed. Reg. 69,755, 69,757 (Dec. 10, 2007); 71 Fed. Reg. 72,736, 72,738 (Dec. 11, 2006); 70 Fed. Reg. 64,097, 64,104 (Oct. 31, 2005).

Finally, in this litigation and the *PETA* litigation the government has confirmed that none of the current regulations apply to birds covered by the AWA, being careful to adhere to the agency's own interpretation in the materials just cited.  For instance, in *PETA I* the government contended that nothing in the AWA required the USDA to apply its general standards to birds.  *See* Reply in Support of Defendants' Motion to Dismiss, No. 13-cv-976, Dkt. No. 13 at 19, 2013 WL 6042366 (Nov. 6, 2013).  In its Motion in this case, the government notably did not contend that its general regulations do actually apply to birds, but only that it should have the freedom to choose what regulations do apply.  In accord with the discussion above, Plaintiffs agree.  And it seems the Agency agrees—it would be difficult not to—that they must indeed make that decision.  They should have made it years ago.

An agency's interpretation of its own regulation, whether that interpretation is in the Federal Register or in litigation, is accorded substantial deference.  *See, e.g.*, *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 208 (2011); *Lewis v. Pension Benefit Guaranty Corp.*, 314 F. Supp.

3d 135, 165 (June 11, 2018).  Even if the government is correct that nothing in the AWA requires it to choose between what type of regulations should be applied to covered birds, the AWA is at least clear that the agency must enact at least *some* variety of regulations that apply to birds as animals covered by the AWA.  *See, e.g.*, 7 U.S.C. § 2143(a)(1) ("The Secretary shall promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors."); *id.* § 2143(a)(3) (directing these standards to include certain regulations with respect to research facilities).[9]  Because there are *no* regulations in place that cover birds, and where the USDA has taken the consistent position that none of its current regulations are applicable to birds, Plaintiffs have sufficiently pled a cognizable claim under Section 706(1).[10]

This is a simple problem of utter failure of an agency to do what it is mandated to do and can be easily fixed as well.  Plaintiffs do not seek to micromanage or tell the Agency how or what to enact – only to engage in the promulgation of regulations that apply to birds.  The choice is the Agency's, and Plaintiffs do not seek to take that choice away.  USDA could comply with its

---

[9] In its Motion, the government relies almost exclusively on the language found in a more general provision of the AWA, 7 U.S.C. § 2151, which simply *authorizes* the Secretary to promulgate rules "as he may deem necessary in order to effectuate the purposes of this chapter." Mot. at 24.  Of course, this broad grant of general authority does not override the agency's mandatory duty in the more specific circumstances outlined in Section 2143.  *See United States v. Chase*, 135 U.S. 255, 260 (1890) ("It is an old and familiar rule that where there is, in the same statute, a particular enactment, and also a general one, which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment." (citations and internal quotation marks omitted)).

[10] Notably, the government does not base its motion to dismiss on an argument that its sixteen year lapse is a reasonable delay.  *See Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 80-81 (D.C. Cir. 1984) (noting that in a prior case a four year delay was found unreasonable, and that delays of five and two years "clearly warrant retaining jurisdiction").

statutory mandate and Plaintiffs' demands by, for instance, formally stating that the current regulations (that it has insisted do not apply to birds) do apply to birds, or it could choose to enact bird-specific regulations. *Norton*, 542 U.S. at 64 (noting that § 706(1) does not empower a court to direct *how* an agency shall comply with its statutory duty, but only to compel it to fulfill that duty). So far, however, it has not done that. Instead, it has continually admitted it must engage in rulemaking, has promised it will do so in order to stave off complaints that it has not, and now tries to evade judicial review by refusing to take action. This is exactly the situation that Section 706(1) was designed to redress.

In sum, Plaintiffs have pleaded a sufficient claim of a cognizable agency failure to act under Section 706(1) at the motion to dismiss stage, and Defendant's motion to dismiss on this ground should be denied.

### 2.    Section 706(2) of the APA

Plaintiffs' second claim for relief is under Section 706(2) of the APA, and challenges the USDA's failure to enact regulations in compliance with its responsibilities under 7 U.S.C. § 2143(a)(1). Section 706(2)(A) allows a court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In its Motion, the government acknowledges that this provision can apply to an agency's failure to act—as it must, for the APA defines an "agency action" as including an agency's "failure to act." 5 U.S.C. §§ 701(b)(2), 551(13).

The government's Motion questions only whether Plaintiffs have sufficiently alleged that the government's failure to enact regulations pursuant to the Congressional directive has sufficiently matured into a "final" agency action, citing 5 U.S.C. § 704. This contention is unavailing, and simply incredible when raised in the sixteenth year of agency inaction after

Congress mandated that the USDA regulate the treatment of birds (and all other covered animals), and the fourteenth year of agency inaction after the agency issued a formal commitment to enact those regulations through an Advanced Notice of Proposed Rulemaking (ANPR) – a promise to the public, based on its duty, which it has never fulfilled.   What has occurred here is the quintessential example of "effectively final agency action that the agency has not frankly acknowledged."  *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987).

"Administrative finality is interpreted pragmatically."  *Sierra Club v. Yeutter*, 911 F.2d 1405, 1417 (10th Cir. 1990).  "[I]f a failure to act amounts to 'consummated "agency action" that APA views as final, notwithstanding the fact that the agency "did" nothing,' a party can seek relief under Section 706(2) of the APA."  *Hi-Tech Pharmacal Co., Inc. v. U.S. Food and Drug Admin.*, 587 F. Supp. 2d 1, 9 (D.D.C. 2008).  Here, Plaintiffs have sufficiently alleged finality under the two factors set forth in *Bennett v. Spear*, 520 U.S. 154 (1997).  First, the course of events set forth in the complaint shows a "consummation of the agency's decisionmaking process."  *Bennett*, 520 U.S. at 178.  In 2004, the USDA issued an ANPR stating it intended to issue bird-specific regulations.  And then it continually reaffirmed its commitment, in both the Federal Register and public meetings year after year, in recognition of its duty, though it ultimately took no action.

For the five years since 2013—even in the face of a challenge to its failure in *PETA I* and the APA's requirement to "conclude a matter presented to" an agency "within a reasonable time," 5 U.S.C. § 555(b)—the USDA has done nothing further, clearly demonstrating it has consummated its decisionmaking with respect to the passage of regulations protecting birds by deciding to do nothing.  As indicated in the Amended Complaint, the USDA has set and missed its own deadlines more than eleven times over the course of sixteen years.  Am. Compl. ¶¶ 60-93.  *Cf. Coalition for Sustainable Resources, Inc. v. U.S. Forest Service* 259 F.3d 1244, 1251 (10th Cir. 2001) (finality

exists where an agency "affirmatively reject[s] a proposed course of action"); *Natural Resources Defense Council, Inc. v. Administrator, U.S. EPA*, 902 F.2d 962, 983-84 (D.C. Cir. 1990) (opinion of Wald, C.J.), *vacated in part*, 921 F.2d 326 (D.C. Cir. 1991) (noting that where an agency "stand[s] mute, indicating neither that a revision is contemplated nor that a decision against revision has been reached . . . [t]he result is no different from a statement by [the agency] that a revision of standards is not appropriate for this rulemaking"); *Wyatt v. United States*, 271 F.3d 1090, 1098 (Fed. Cir. 2001) (noting that in the takings context, an "extraordinary delay in governmental decisionmaking," such as one of eight years, gives rise to a ripe takings claim).

Plaintiffs have also sufficiently alleged that the agency's inaction is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178. As in *Bennett*, the agency's inaction here significantly "alter[s] the legal regime to which the action agency is subject," by eliminating a substantial number of animals from their undisputed coverage intended by Congress in enacting the AWA. *Id.* The USDA has used its prolonged inaction and the absence of regulations that it deems applicable to birds to justify the complete lack of regulation of facilities housing birds not bred for research. For instance, as discussed above, a recent GAO report found that "APHIS instructs facilities to not report any birds in their annual reports, regardless of whether they were bred for use in research." GAO, *Animal Use in Federal Research*, GAO 18-459 at 13 (May 2018), *available at* https://www.gao.gov/products/GAO-18-459.

And the consequences of the agency's inaction, as pled in the Amended Complaint, are also dire and counsel for immediate action. Paragraphs 98–100 of the Amended Complaint set out a short list of examples of the kinds of problems that are flowing from the agency's failure to act,

and the harm and suffering that will continue as long as the Agency continues its standoff with its own regulations.

Because Plaintiffs have sufficiently pled agency inaction that is final for purposes of the APA, the Court should deny the government's motion to dismiss their claim under Section 706(2).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court deny Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.


Dated:  September 7, 2018                         Respectfully submitted,


                                                 MCGUIREWOODS LLP

                                                 */s/ E. Rebecca Gantt*
                                                 E. Rebecca Gantt (D.C. Bar # 988752)
                                                 World Trade Center
                                                 101 West Main St.
                                                 Suite 9000
                                                 Norfolk, VA 23510
                                                 (t) (757) 640-3731
                                                 (f) (757) 640-3940
                                                 (e) rgantt@mcguirewoods.com


                                                 SCHIFF HARDIN LLP

                                                 */s/ Bruce A. Wagman*
                                                 Bruce A. Wagman (admitted *pro hac vice*)
                                                 One Market Street, Spear Tower, 31st Fl.
                                                 San Francisco, CA  94105
                                                 (t) 415-901-8762
                                                 (e) bwagman@schiffhardin.com

                                                 *Attorneys for Plaintiffs AAVS & AWC*