# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN ANTI-VIVISECTION SOCIETY *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE *et al.*, <br><br> Defendants. | Case No. 1:18-cv-01138 (TNM) |

## MEMORANDUM OPINION

The timberdoodle—a member of the woodcock family—is the world's slowest flying bird, with a recorded speed of just five miles per hour during its aerial courtship displays. By contrast, the peregrine falcon can reach speeds of up to 240 miles per hour when stooping for prey. But even the timberdoodle seems falconesque compared with the U.S. Department of Agriculture. It announced its intent to extend the protections of the Animal Welfare Act ("AWA" or the "Act") to birds in 2004, but fourteen years later it has yet to land on avian-specific standards. It has also declined to apply the Act's existing general regulations to birds.

Seeking to compel action, the American Anti-Vivisection Society and the Avian Welfare Coalition (the "Plaintiffs") sued the Department of Agriculture its Secretary, Dr. Sonny Perdue (collectively, the "Department"). Unfortunately for the Plaintiffs and their feathered friends, their flightpath has been tried and denied before. *See People for the Ethical Treatment of Animals, Inc. v. United States Dep't of Agric.*, 7 F. Supp. 3d 1 (D.D.C. 2013) ("*PETA I*"), *aff'd*, 797 F.3d 1087 (D.C. Cir. 2015) ("*PETA II*"). Following the precedent established by the D.C.

Circuit in *PETA II* and the sound reasoning of *PETA I*, the Court will grant the Department's Motion to Dismiss.

## I.

The AWA seeks to ensure that animals intended for use in research facilities, for exhibition purposes, or as pets are provided humane care and treatment. 7 U.S.C. § 2131(1). To this end, the Act requires the Department of Agriculture to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." *Id*. § 2143(a). It also authorizes the Secretary to "make such investigations or inspections as he deems necessary" to determine whether the Department's standards have been violated. *Id*. § 2146(a).

At first, the term "animal" included only "dogs, cats, monkeys (nonhuman primate mammals), guinea pigs, hamsters, and rabbits." 7 U.S.C. § 2132(h) (1966). In 2002, Congress amended this definition to exclude birds, rats, and mice "bred for use in research." 7 U.S.C. § 2132(g). The Department interpreted this change to mean that Congress intended to protect birds not bred for research, so it amended its regulations by "narrowing the scope of the exclusion" previously applicable to avian species. *See* Regulations and Standards for Birds, Rats, and Mice, 69 Fed. Reg. at 31,537-38 (2004).

To protect the animals covered by the Act, the Department has issued a set of general welfare standards. *See* 9 C.F.R. §§ 3.125 – 3.142. It has also promulgated regulations specific to dogs, cats, nonhuman primates, and other mammals. *See id*. §§ 3.1 – 3.118. Department personnel have suggested that they "do not believe that the general standards . . . would be appropriate or adequate to provide for the humane handling, care, treatment, and transportation

of birds." 69 Fed. Reg. at 31,539. So in 2004, the agency announced an intent to establish "standards for birds not specifically excluded from coverage under the AWA." *Id*.

But nothing happened. Rather, the Department has repeatedly noted its intent to create bird-specific regulations, setting and missing several deadlines for publication of these rules. *See, e.g.* 70 Fed. Reg. at 64,104 (2005); 72 Fed. Reg. at 22,266 (2007); 73 Fed. Reg. at 24,640 (2008); 78 Fed. Reg. at 1526 (2013); Am. Compl. 17-21, ECF No. 15 (collecting citations). Without federal regulatory oversight, the Plaintiffs claim, birds at research facilities and zoos have been "denied food, water, . . . and sanitation," attacked and killed by feral dogs, and have died "from starvation or parasites." *Id*. at 22.

The Plaintiffs are not the first to raise this concern. A few years ago, PETA sued the Department over its failure to issue avian regulations. *See PETA I*, 7 F. Supp. 3d at 6. The Department moved to dismiss, arguing that PETA lacked standing and that the Act did not require regulatory action. *Id*. at 7. Judge Boasberg concluded that PETA had standing to sue, but it had failed to state an APA claim upon which relief can be granted for three reasons. *See id*. at 9-15. First, the court found that individual Department decisions not to apply the general animal welfare standards to birds were committed to agency discretion by law. *Id*. at 11-15. Second, PETA had identified no concrete statement by the Department of a general policy not to regulate birds under the AWA. *Id*. And third, the text of the AWA did not require the Department to adopt bird-specific regulations. *Id*.

PETA's arguments did not fly with the appellate court either. *PETA II*, 797 F.3d at 1089. The D.C. Circuit agreed that PETA had standing because the organization had "adequately shown that the [Department's] inaction injured its interests and, consequently, PETA has expended resources to counteract those injuries." *Id*. at 1094. The circuit court also agreed with

3

the district court that PETA had failed to state a claim, but for slightly different reasons. It found that "nothing in the AWA requires the [Department] to apply the general animal welfare standards to birds . . . before it has promulgated more appropriate bird-specific regulations." *Id*. at 1098. It also determined that the Department had not failed to take any action that it was required by law to take. *Id*. at 1099. Thus, the D.C. Circuit concluded that "PETA failed to plausibly allege that the [Department's] decade-long inaction constitutes agency action unlawfully withheld" as required to establish an APA § 706(1) claim. *Id*. at 1098.

Here, the Plaintiffs are animal welfare organizations that provide education and training on the humane treatment of animals, support animal sanctuaries, and create reports on the conditions of animals in regulated facilities. *Id*. at 3-12. They contend that the Department's failure to promulgate bird-specific regulations is unreasonable, unlawful, and arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). Thus, they seek court-ordered deadlines by which the Department must propose and finalize such rules. *Id*. at 25.

As in the PETA litigation, the Department has moved to dismiss the Plaintiffs' claims. It argues that the Plaintiffs lack standing to sue, that it is not required by law to promulgate the regulations sought, and that it has not taken a final action reviewable by the Court. *See* Defs.' Mem. in Supp. of Mot. to Dismiss, ECF No. 16-1 ("Defs.' Mem.").

In short, the Plaintiffs believe that they are like PETA in that they have standing but unlike the organization in that their claims should survive a motion to dismiss. The Department, on the other hand, contends that this case is distinguishable from *PETA II* on standing grounds, but that the prior holdings foreclose the Plaintiffs' substantive claims.

## II.

Whether the Plaintiffs have standing to sue is a "threshold jurisdictional question." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102 (1998). Article III of the U.S. Constitution limits this Court's jurisdiction to "actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies," and the "concept of standing is part of this limitation." *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 37 (1976) (citation omitted).

To show standing, the Plaintiffs bear the burden of alleging an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper*, 568 U.S. at 409. Facing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), they "must clearly allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (cleaned up). The Court will "draw all reasonable inferences from [the Plaintiffs'] allegations in [their] favor," but will not "accept inferences that are unsupported by the facts," "assume the truth of legal conclusions," or credit "threadbare recitals of the elements of standing." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

The Defendants also seek dismissal for a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A valid complaint must contain factual allegations that, if true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Mere "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement" are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).

Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

In evaluating a motion to dismiss, a court must construe the complaint in the light most favorable to the Plaintiffs and accept as true all reasonable factual inferences drawn from well-pleaded allegations. *In re United Mine Workers of Am. Emp. Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994). A court need not, however, accept legal conclusions or mere conclusory statements as true. *Iqbal*, 556 U.S. at 678. Evaluating a motion to dismiss is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

### III.

Under the D.C. Circuit's permissive precedent, the Plaintiffs have "organizational standing" to bring their claims. The concept of organizational standing arises from the Supreme Court's determination that a "concrete and demonstrable injury to [an] organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Impediments to lobbying, abstract policy goals, or "pure issue-advocacy cannot establish standing." *Elec. Privacy Info. Ctr. v. Fed. Aviation Admin.*, 892 F.3d 1249, 1255 (D.C. Cir. 2018). A two-pronged inquiry is thus required. First, the Court must determine "whether the agency's action or omission to act injured the [Plaintiffs'] interest." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). Second, it must identify whether "the [Plaintiffs] used [their] resources to counteract that harm." *Id*.

6

To satisfy the first prong, "an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services." *Id*. The American Anti-Vivisection Society asserts that it sends annual reports to its members about the conditions of animals covered by the AWA. Am. Compl. 5. They compile these reports based on materials the Department creates to monitor the animals covered by the Act. *Id*. "Because USDA does not have regulations related to birds and therefore does not report on the conditions of birds covered by the AWA, [the Society] cannot provide that vital information to its members and the public." *Id*. The Society also suggests that if the Department "regulated birds not bred for use in research, it would maintain records on the treatment of such birds, as it typically does for all other animals covered by the AWA." *Id*. Such records would allow the Society to "use the Freedom of Information Act ("FOIA") to obtain USDA records that would assist it in identifying situations of abuse and neglect of birds, so that it could report such conduct to its members and the proper authorities." *Id*.

Similarly, the Animal Welfare Coalition alleges that it "provides resources for individuals who have witnessed and want to report bird abuse or neglect." *Id*. at 10. It is "severely limited" in its ability to help these individuals "because USDA has denied this avenue of redress through its lack of regulations regarding birds, and its refusal to respond to calls regarding birds in distress who are covered by the AWA." *Id*. at 11. The Coalition has also "develop[ed] a series of webinars that provide training to animal care professionals on the specialized care of exotic birds," webinars to train prosecutors on how to identify bird abuse, and other trainings and educational materials. *Id*. at 9-10.

To satisfy the second prong of the inquiry, the Plaintiffs must show that they have expended resources to remedy the harms allegedly suffered. *Food & Water Watch*, 808 F.3d at

7

920. These expenditures must be "operational costs beyond those normally expended" by the organizations. *Id*. The Society contends that, because of the Department's "unlawful withholding of regulations," it has been forced to "dedicate resources [to] and engage in . . . public education, publication of special reports, attendance at meetings discussing the use of birds in commercial activities, and providing information to its members and the public." Am. Compl. 6. "But for" the lack of regulations, the Society "would have devoted its time, resources[,] and funds to . . . [the] support of sanctuaries housing providing care to retired laboratory animals, investigating alternatives to the use of animals in biomedical research," and other initiatives. *Id*.

The Coalition claims that it has "utilized its precious resources" to develop materials and trainings on the appropriate treatment of birds that would be unnecessary if the Department issued its own standards. *Id*. at 9-10. For example, it created a series of "How to Guides for Bird Shelters and Care Facilities." *Id*. at 9. If the Department "enacted regulations protecting birds, [the Coalition] would then spend its resources on different programs, such as responding to reports of bird cruelty." *Id*. at 10.

The Department strenuously urges the Court to conclude that these claims are the sort of "abstract" concerns that do not impart standing. Defs.' Mem. at 16. It contends that "educational advocacy" efforts and assertions of an "informational injury" should not confer standing upon an organization. *See id.* at 10-17. These "purported injuries," it argues, are merely the type of "lobbying and issue advocacy activities" rejected by the D.C. Circuit in *Elec. Privacy Info. Ctr. v. Fed. Aviation Admin*. *Id*. at 10.

The Department's skepticism is understandable. The Plaintiffs' position is essentially that the government should do more to protect birds, and that they have "voluntarily taken steps

to protect birds [themselves]" because of the lack of federal oversight. *PETA II*, 797 F.3d at 1099 (Millett, J., dubitante). While these steps "may be laudable," they have traditionally not provided a basis for Article III standing given the longstanding principle that "an individual's interest in having the law properly enforced against others is not, without more" legally cognizable. *Id*. (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). Judge Millett argued in *PETA II*, for instance, that claims of an "informational injury should not open the Article III door" where "there is no suggestion that anything in the Animal Welfare Act or any regulation gives [an organization] any legal *right* to such information or reports." *Id*. at 1103 (emphasis in original). So too here.

And the Court doubts the lost opportunity to file FOIA requests would alone confer standing. *See Judicial Watch, Inc. v. Office of Director of Nat'l Intelligence*, 2018 WL 1440186 at *3 (D.D.C. March 22, 2018) (holding that the plaintiff could not rely on a desire to file FOIA requests to establish standing to sue under an unrelated regulation); *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (noting that to establish a sufficiently concrete and particularized informational injury, a plaintiff must show it has been deprived of information that "on its interpretation, a statute requires the government or a third party to disclose to it"). Bootstrapping FOIA requests to justify organizational standing would be particularly inappropriate here, where the Society claims to want to use information derived from FOIA to report avian abuse and neglect to the authorities. This would be like reporting crimes to the police based on information from police reports.

More still, unlike in other organizational standing cases, the Plaintiffs here failed to identify specific expenses undertaken in response to the lack of avian regulations. *Compare PETA II*, 797 F.3d at 1096 ("PETA estimates that, as a direct result of the USDA's failure to

regulate birds . . ., it has been forced to expend more than $10,000 on staff attorney time not related to this litigation and related expenses"); *Envtl. Working Grp. v. U.S. Food and Drug Admin.*, 301 F. Supp. 3d 165, 171 (D.D.C. 2018) ("EWG has spent approximately $1,365,000 in total expenses to combat" the alleged effects of an agency's inaction).

But the Plaintiffs' organizational standing allegations are similar enough to *PETA II* to dictate the outcome here. As there, the Plaintiffs have, "at the dismissal stage, adequately shown that the USDA's inaction injured [their] interests and, consequently, [they have] expended resources to counteract those injuries." *PETA II*, 797 F.3d at 1094. They have alleged with enough supporting factual allegations that the challenged agency decisions "deny [them] access to information and avenues of redress they wish to use in their routine information-dispensing, counseling, and referral activities." *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 937-38 (D.C. Cir. 1986). In other words, they have plausibly "alleged inhibition of their daily operations, . . . an injury both concrete and specific to the work in which they are engaged." *Id*. at 938.

This injury—an inability to gather information, publish reports, and help reduce the neglect and abuse of birds—is traceable to the Department's inaction and could be redressed by an order compelling the Department to issue regulations. And the Plaintiffs have pointed to webinars and other educational programs they must produce in the absence of applicable avian regulations. The Court finds that the Plaintiffs have standing and that it has jurisdiction to consider the merits of their arguments.

**IV.**

The Plaintiffs make two substantive claims. First, they allege that the Department's failure to promulgate regulations applicable to birds "violates the AWA and constitutes agency

10

action unlawfully withheld and unreasonably delayed in violation of the APA, 5 U.S.C. § 706(1)." Am. Compl. 23. Second, they contend that the decision not to issue these standards "constitutes an effectively final agency action that is arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the APA, 5 U.S.C. § 706(2)." *Id*. at 24. Both claims fail.

### A.

The Plaintiffs' first claim is based on their belief that "Section 2143 of the AWA unequivocally requires that the USDA promulgate standards and other requirements governing the humane handling, care, treatment, and transportation of animals covered by the AWA, which includes birds." Am. Compl. 23 (citing 7 U.S.C. § 2143(a)). Despite the Act's "clear and undisputed statutory mandate to enact regulations that protect birds, the USDA has failed to fulfill this imperative for over fifteen years." Pls.' Mem. in Opp. to Defs.' Mot. to Dismiss 26, ECF No. 17 ("Pls.' Mem."). The Plaintiffs thus "seek judicial intervention to force the agency's hand to do what it is required to do, since it refuses it act." *Id*. at 27.

Section 706(1) of the APA requires the Court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). A claim under § 706(1) of the APA "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original). "These limitations rule out several kinds of challenges," including requests for "judicial direction of even discrete agency action that is not demanded by law." *Id*. at 64, 65.

The Plaintiffs have failed to sufficiently allege a discrete agency action that the Department must take. As the *PETA I* court notes, "Section 2143 of the AWA does not require the USDA to issue avian-specific animal welfare standards." 7 F. Supp. 3d at 14. Rather, it

states that the Secretary "shall promulgate standards to govern the humane handling, care, treatment, and transportation of *animals* by dealers, research facilities, and exhibitors." 7 U.S.C. § 2143(a)(1) (emphasis added).

The plain language of the Act requires the Department to issue welfare standards generally applicable to animals. It has done so. *See, e.g.*, 9 C.F.R. § 3.125. Section 2143 does require the Department to develop *specific* "minimum requirements for [the] exercise of dogs . . . and for a physical environment adequate to promote the psychological well-being of primates." 7 U.S.C. § 2143(a)(2)(B). But aside from this requirement, "the AWA leaves to USDA's discretion the question of whether specific standards are appropriate for each covered animal or if the general standards will suffice." *PETA I*, 7 F. Supp. 3d at 14. Indeed, Section 2143's specific requirement for canine and primate-related regulations suggests that the Department has latitude when it comes to issuing rules for other species.

The Plaintiffs say that they are not necessarily seeking bird-specific regulations. Pls.' Mem. at 29. They suggest that the Department has, through various public statements, "unfailingly interpreted its own general animal welfare regulations . . . as *not* applying to birds." *Id*. (emphasis in original). This, coupled with the lack of bird-specific regulations, they argue, effectively renders birds unprotected in violation of the Act. *Id*. at 29-32. The agency's purported failure to act could thus be remedied either by "formally stating that the current regulations . . . do apply to birds," or by "enact[ing] bird-specific regulations." *Id*. at 33.

But this framing is merely a linguistic sleight of hand—the Plaintiffs are in fact seeking regulations specifically for birds. They do not quibble with the existing rules.

And "even if the USDA has adopted an *interim* policy of non-enforcement pending the adoption of bird-specific regulations . . . nothing in the AWA requires the USDA to apply the

12

general animal welfare standards to birds . . . before it has promulgated more appropriate bird-specific regulations." *PETA II*, 797 F.3d at 1098 (emphasis in original). As the *PETA I* court notes,

> "the fact that USDA believes that it must contemplate, and eventually adopt, bird-specific regulations does not mean that the agency has concluded that those regulations are essential as of this moment; in the meantime, the agency might believe that the general animal-welfare regulations will do just fine. [The Plaintiffs] cite[] no authority for the proposition that USDA's public statements can create binding obligations on the agency enforceable under § 706(1). On the contrary, the Supreme Court has indicated that "[a] statement by [an agency] about what it plans to do, at some point, provided it has the funds and there are not more pressing priorities, cannot be plucked out of context and made a basis for suit under § 706(1)."

7 F. Supp. 3d at 15 (citing *Norton*, 542 U.S. at 71).

True, the PETA litigation did not address the unreasonableness of the Department's now fourteen-year delay in creating the standards the Plaintiffs seek. But the Court can only compel "legally required" agency action. *Norton*, 542 U.S. at 63. Here, the AWA does not mandate the promulgation of rules specifically applicable to birds. Its language "would support a judicial decree under the APA requiring the prompt issuance of animal welfare regulations, but not a judicial decree setting forth the content of those regulations." *PETA I*, 7 F. Supp. 3d at 14 (cleaned up). And, as the Department has issued general animal welfare regulations, the Court cannot "say that the USDA has failed to take action it was 'required to take.'" *PETA II*, 797 F.3d at 1099 (quoting *Norton*, 542 U.S. at 64). After all, the "principal purpose of [these] APA limitations . . . is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton*, 542 U.S. at 66. The Plaintiffs' § 706(1) claim cannot stand.

**B.**

Their § 706(2) claim fares no better. Only a "final agency action" is reviewable under the APA. 5 U.S.C. § 704. For an action to be "final," it must satisfy two conditions. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up). Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id*. When "a failure to act is the basis for an APA claim pursuant to Section 706(2), a plaintiff must show that it is the functional equivalent of final agency action." *Hi-Tech Parmacal Co. v. U.S. Food and Drug Admin.*, 587 F. Supp. 2d 1, 10 (D.D.C. 2008).

Frustrating though the Department's delay may be, it is not a final agency action. As the Plaintiffs concede, the Department has "continually reaffirmed its commitment, in both the Federal Register and public meetings year after year" to issue bird-specific regulations. Pls.' Mem. at 34. Indeed, that the agency "has set and missed its own deadlines more than eleven times over the course of sixteen years" suggests an ongoing, if incredibly slow, process. *Id*.

Allegations the issue may have "completely fallen off the regulatory agenda," or that the agency "still has done nothing to protect" avian species despite its frequent statements of intent do not support a § 706(2) action either. While the Department appears to have stopped setting these deadlines, *see id.*, it has neither taken any action nor issued anything suggesting that it will not to promulgate bird-specific regulations. Some things take more time. Just ask a timberdoodle.

The Plaintiffs have thus failed to sufficiently allege facts showing a consummation of the Department's decisionmaking process about the protection of birds under the AWA. This claim must also be dismissed.

## V.

For these reasons, the Defendants' Motion to Dismiss will be granted. A separate order will issue.

Dated: December 10, 2018                                TREVOR N. McFADDEN, U.S.D.J.